## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

In The Matter of the Search of DNA Buccal Samples From Taylor Ruffin-Herrington (DOB:            )

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Jeffrey W. Stephenson, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rules of Criminal Procedure 41 authorizing law enforcement to obtain DNA buccal samples from Taylor Ruffin-Herrington (DOB:            ), who is presently in the custody of the U.S. Marshals Service at the Cheshire County Jail, within the District of New Hampshire. The methods proposed to be used by the government to effect this search are further described within the following paragraphs and in Attachments A and B.

2. I am a Federal Bureau of Investigation ("FBI") Task Force Officer and have been since October 1, 2017. I am assigned to the FBI's Albany, New York Field Division, Vermont Resident Agency. As an FBI Task Force Officer, I am a "federal law enforcement officer" as defined in Federal Rule of Criminal Procedure 41(a)(2)(C), authorized to investigate violations of the United States Code under Titles 18 and 21, to include applying for search warrants. I am employed by the Vermont State Police ("VSP") as a Detective Sergeant and am a certified law enforcement officer in the State of Vermont, having been certified by the Vermont Criminal Justice Training Council for over 14 years. During my career, I have received extensive training related to criminal investigations. I have authored

numerous search warrants and participated in hundreds of criminal investigations, many involving the investigation of violent crime(s) and controlled substance distribution. I am also an assistant team leader with the VSP Crime Scene Search Team and have training and experience in collecting DNA evidence.

3. The facts in this affidavit come from information I learned from other law enforcement officers and from witnesses, as well as from my own investigation. Because this affidavit is intended only to establish probable cause for the requested warrant, it does not set forth all of my knowledge about this matter.

4. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841(a)(1) and 846 (distribution of, and conspiracy to distribute, controlled substances) and 18 U.S.C. § 924(c) (use of a firearm during and in relation to a drug trafficking crime) have been committed by individuals, including Taylor Ruffin HERRINGTON (also known as "Tee" or "Tease"). There is also probable cause to obtain the DNA buccal samples described in Attachment A as evidence of these crimes, as further described in Attachment B.

## PROBABLE CAUSE

5. Based upon information I received from VSP detectives on March 3-4, 2020, including from Lieutenant JP Schmidt, Sergeant James Vooris, and Sergeant Drew Cota, I know the following information. I have discussed these details with them, and they have confirmed the accuracy of this information. I have further recently spoken with Sergeant Vooris and learned that this information is still true and accurate to the best of his knowledge.

6. On March 3, 2020, at or about 2:50 AM, Michael Haines and Amy Pudvah contacted VSP and reported that an individual known as "Tee" was attempting to enter their residence at 96 Hillside Drive #2 in Cambridge, Vermont. According to Haines and Pudvah, Tee

2

was with a person named "Sam Simms," in Simms' truck. Tee left in the truck, but then returned to the residence a short time later. While Haines was speaking with a VSP trooper via telephone, he told the trooper he had been shot. Pudvah was in the residence with Haines; after Haines was shot, she ran upstairs to her two children, who were also in the residence.

7.     Troopers arrived at the residence at approximately 3:50 AM. They saw a male on the kitchen floor, believed to be Haines, who appeared to be deceased. He was pronounced deceased by Cambridge Rescue at approximately 3:57 AM. Pudvah and her two children were found barricaded in an upstairs room. Troopers then secured the residence.

8.     The Office of the Chief Medical Examiner later identified the victim as Haines, ruling cause of death as a gunshot wound to the abdomen and manner of death as homicide.

9.     While on scene, Sergeant Vooris learned there was a black duffle bag that had been thrown into the backyard during the incident. The yard was covered in snow, and footprints were visible in the snow to the right of the front of the home. Investigators did not find a duffle bag.

## Amy Pudvah Interview

10.     On March 3, 2020, Sergeant Vooris and Sergeant Cota interviewed Amy Pudvah[1] at the Cambridge Fire Department, following Haines' death. Pudvah told detectives the following:

   a. Haines had recently told Pudvah that he had been using heroin. Haines would disappear for days at a time.

---

[1] Amy Pudvah has a misdemeanor conviction for careless or negligent vehicle operation dating from 2009.

b. On March 2, 2020, Haines asked Pudvah to provide a ride to his friend, known to Pudvah as "Tee," from Burlington to their home in Cambridge, Vermont. Pudvah picked Tee up in the area of Intervale Avenue and Willow Street in Burlington at about 3:30 PM on March 2, 2020. Prior to getting into the car, Tee placed a duffle bag in the trunk. "Tee" told Pudvah he was from Philadelphia, Pennsylvania and was born in August of 1991.

c. Pudvah drove Tee back to her home in Cambridge. After returning to the residence, Tee and Haines went to the basement. Haines and Tee left at approximately 8:00 PM that day, indicating they were going to the store for beer. They returned approximately 40 minutes later. Tee and Haines left the residence again between 10:30-11:00 PM, and Haines returned home alone at approximately 1:15 AM on March 3, 2020. Pudvah asked where Tee was, and Haines said he dropped Tee off at Becky Bessette's house. After Haines returned home at about 1:15 AM, Pudvah saw Tee's duffle bag was still in the basement. Haines then left the residence again for about 30 minutes. Haines told Pudvah that he went to his friend Matthew Gillespie's house.

d. Pudvah was in the kitchen getting ready for bed when she observed a dark-colored pickup truck pull into the driveway. Haines told Pudvah that the vehicle belonged to "Sam Simms." Haines told Pudvah to call the police and said that he had been in a fight with Tee. Someone then began knocking aggressively at the door. Pudvah was standing in the living room when she heard the knocking. Haines walked toward the door and was telling the person at the door to leave and that he was on the phone with the police. When Haines went toward the door, the

4

        male at the door was saying he wanted his duffle bag. Haines went to the basement, got the duffle bag, and threw it over the back deck. Pudvah said that the truck left the residence and took a right out of the driveway, which is a dead end. Pudvah said that she and Haines were on the phone with VSP dispatch throughout the incident.

    e. The truck was gone for about 15 minutes before returning. When the truck returned, it pulled into the driveway, and Pudvah saw Tee at the door.  Haines went to the door and told Tee the bag was out back.  Pudvah heard what she thought was a pellet gun and then saw Haines on the floor saying, "I'm shot, I'm shot."

11. Pudvah told VSP detectives that the phone number          -1040 belonged to Tee.

12. Pudvah also told detectives that she and Haines shared a phone. She showed investigators a text message conversation on that phone between Haines and Becky Bessette that occurred between 11:38 PM on March 2, 2020 and 3:11 AM on March 3, 2020. Some of the text messages in that time frame are as follows:

    a. Becky: Yo Mike what the f*** are you doing to my boy come on now he don't deserve that he's been good to you

    b. Becky: He won't answer the f****** phone I just messaged him and said y'all what are you trying to do to my boy he's been f***** nothing but good to you

    c. Becky: Dude your neighbors are going to end up calling the cops and believe me D.C.F WILL get involved and take your babies come on dude that shit is not worth it.

13. In addition to reviewing the texts between Haines and Bessette, investigators reviewed texts on the Haines/Pudvah phone that Haines/Pudvah exchanged with the 1040 number over the TextNow application. Some of those texts are as follows:

   a. On March 1, 2020,          1040 sent a text to Haines/Pudvah which read: "Yo this is tee." Haines and Tee then exchanged a series of texts in which Haines and Tee tried to arrange a meeting. Haines apparently could not find a ride and did not have a car, so the meeting did not occur.

   b. On March 2, 2020 at approximately 11:00 AM, Haines sent Tee a text in which Haines told Tee that his "girl" had the car and would pick Tee up. A couple of hours later, Pudvah exchanged a series of text messages with Tee, arranging to pick him up in Burlington around Archibald and Intervale.

   c. On March 3, 2020 at approximately 12:55 AM, Tee texted Haines/Pudvah and said: "Ayo where did u go." Haines/Pudvah did not respond to that text.

14. There are no other text messages between Haines/Pudvah and the number 040 after the 12:55 AM text. However, between 12:31 AM and 1:44 AM on March 3, 2020, the          1040 called the Haines/Pudvah phone seventeen times. None of those calls were answered by Haines/Pudvah.

Matthew Gillespie Interview

15. On March 3, 2020, Sergeant Cota interviewed Matthew Gillespie.[2] Gillespie told Sergeant Cota the following:

---

[2] Matthew Gillespie has a criminal history including the following misdemeanor convictions: vehicle operation-careless or negligent, in 2019; Vehicle operation-without owner consent, in 2017; petit larceny

a. During the evening of March 2, 2020, Haines came to Gillespie's house with a black male named Tee. They offered to sell Gillespie two bags of heroin, but Gillespie turned that down. Haines then left with Tee and said he was going to buy beer.

b. Later that evening, Gillespie texted Haines and said he would buy the heroin. Haines came back to Gillespie's house, but Tee was no longer with Haines. Haines had a gallon-sized zip lock bag of heroin. Gillespie estimated that there were approximately 60 to 90 bundles of heroin in the zip lock bag, with a single bundle containing approximately 10 individual bags of heroin.

c. Gillespie asked Haines where Haines got that much heroin, and Haines replied, "I got that nigger." Gillespie took that to mean that Haines had stolen the heroin from the black male named "Tee" who was at Gillespie's house earlier with Haines.

d. Gillespie later used some of the heroin, overdosed, and was treated by medical staff.

---

$900 or less, in 2014; DUI (first offense), vehicle operation-attempt to elude LE officer, and violation of probation, in 2014; providing false information to a law enforcement officer/implicating another and violation of probation, in 2013; vehicle operation-careless or negligent, in 2012; and disorderly conduct-fight, etc., in 2012.

Becky Bessette Interview

16. On March 3, 2020, members of the Burlington Police Department interviewed Becky Bessette.[3] Officers had a potential identification of Tee as an individual known to law enforcement as Taylor Ruffin HERRINGTON, and Bessette identified a booking photograph of Taylor Ruffin HERRINGTON as "Tee" from her multiple encounters with him over several months. Bessette told officers the following regarding Tee:

   a. Tee had "bupe" and "down.[4]" Tee was at Haines' residence on in the Cambridge/Jeffersonville area on March 2, 2020. Bessette wanted Tee to return to town so she could "get well.[5]" On March 2, 2020 at about 11:38 PM, Bessette sent a text message to Haines asking where he was and learned that Haines was with Tee in Bessette's driveway. They all began hanging out together.

   b. Tee and Haines were waiting on Simms because she was going to purchase "down." While they waited, they used heroin. Bessette realized that Haines was

---

[3] Becky Bessette has a criminal history including a felony conviction for buying, receiving, selling, possessing, or concealing stolen property in 2000, as well as misdemeanor convictions for: retail theft of $900 or less, in 2019; petit larceny of $500 or less, in 2007; simple assault and violation of probation, in 2005' unlawful mischief involving $250 or less and violation of probation, in 2005; theft of service of $500 or less, in 2004; assault & robbery amended to petit larceny, simple assault, and violation of probation, in 2004; passing a bad check and violation of probation, in 1997; retail theft, in 1997; and disorderly conduct, in 1997.

[4] "Bupe" and "down" are colloquial terms, respectively, for Buprenorphine (a controlled narcotic drug used for opiate addiction treatment), and heroin (a controlled substance).

[5] The phrase "get well" in this context refers to someone using a controlled substance or substances in order to avoid experiencing withdrawal symptoms.

8

      gone, and no one knew he left. Tee became upset and began going to multiple other homes in Burlington looking for Haines.

    c. Tee asked Bessette to have Simms pick him up on Intervale Avenue and drive him to Haines' house. Tee called Bessette at 2:57 AM and told her he was at Haines' house knocking on the door. Bessette could hear whoever was inside the residence threatening to call the police and could hear that Tee wanted his keys, wallet, and "work."[6] Bessette thought she heard gunshots on the phone but was not certain.

    d. Bessette later spoke with Tee and learned he got his wallet and keys back. Tee later told Bessette not to tell anyone they were together.

17. Bessette told the officers that Tee was using a new phone number     3454, which she learned of when Tee called her three times from that number on the afternoon of March 3, 2020. Bessette consented to a search of her cellular phone, and officers reviewed portions of her call and text histories. The officers noted that Bessette's phone had received three calls from     3454 that afternoon. Bessette said she had spoken with Tee during the third call, because she had not answered the first, and the second had a poor connection. Following those calls, still on the afternoon of March 3, 2020, Bessette exchanged text messages with the numbe     2551, which was associated with the contact name "Sam" in Bessette's phone. Bessette indicated "Sam" was Samantha Simms. The photograph below of Bessette's phone shows the relevant portion of their exchange:

---

[6] "Work" is a colloquial phrase for a drug dealer's supply of controlled substances.



18.     According to Bessette, "T" and "him" in her messages referred to Tee (i.e.,

HERRINGTON), and Sam knew Tee as "Tease" or "Teeze." Using zetx.com—an open-source

database for which I have an account and that I have found reliable in the past to determine

which carrier provides service to a given phone number—I determined            3454 was a

number assigned to Bandwidth Inc. On March 3, 2020, I contacted Bandwidth Inc. and learned

Bandwidth Inc. had leased the number to a company called Pinger, Inc. I contacted Pinger, Inc.

and learned that          3454 was a number Pinger, Inc. had leased and assigned to their

customers.

Samantha Simms Interview

19.   On or about March 3, 2020, Samantha Simms was arrested by the FBI and VSP after she distributed suspected methamphetamine during a controlled purchase in Winooski, Vermont.[7] At the time of the controlled purchase and the time of her arrest, Simms was driving a 2020 GMC truck.

20.   Following her arrest, Simms was transported to the VSP barracks in Williston, Vermont where she was advised of her *Miranda* rights and agreed to talk with investigators. Simms was not made any promises, nor were threats made to Simms in exchange for her statements. Based upon my review of police reports and conversation with Sergeant Vooris, I know that Simms told Sergeant Vooris the following information in an audio and video-recorded interview:

   a. After picking "Tease" or "Tee" up in Burlington, Vermont, Simms drove "Tease" or "Tee" to Haines' residence in Cambridge, Vermont in the early morning hours of March 3, 2020. No one else was with them. "Tee" provided Simms with driving directions to find the residence. She drove the same truck she was arrested in, the 2020 GMC Canyon Denali, color black.

   b. Once they arrived at Haines' residence, "Tee" approached the residence and knocked on the door. "Tee" used his phone, returned to Simms' truck, and told her the police were being called. Simms drove Tee away from the residence; 10-15 minutes later they returned, and Tee approached the residence and knocked on

---

[7] Simms was later convicted of this offense (21 U.S.C. 841(a)(1)) in the U.S. District Court for the District of Vermont. In addition, Simms has a criminal history including a misdemeanor conviction for False information -LE officer/implicate another in 2019.

11

the door again. Simms did not see any firearms, nor did she hear any gunshots. She never got out of the truck. Simms saw Tee was in possession of a black bag when he returned to the truck. Simms drove Tee back to the Burlington, Vermont area.

21. On March 10, 2020, Simms was interviewed at the U.S. Attorney's Office in Burlington, Vermont. Simms was represented by counsel during this interview which was subject to a standard U.S. Attorney's Office-District of Vermont proffer agreement. During this interview, Simms provided the following information:

   a. Simms first met Tee in or about 2017 in the Chittenden County, Vermont area. She came to learn Tee was part of a group of people who were selling drugs in Vermont. Simms believed she saw Tee with cocaine base for sale. At some point, Simms lost contact with Tee.

   b. On March 2, 2020, Simms arrived at Becky Bessette's house in Burlington, Vermont and saw Tee and Haines were there. They all spent time together before Simms noticed Tee and Haines had left. She did not see if they left together. Immediately after Tee left, however, he called Bessette asking where Haines went. About five minutes later, Tee called Bessette again and asked where Haines had gone. Simms learned Haines had likely left in his vehicle just before Tee made it to the parking lot. One to two hours later, Tee called Bessette again. Simms learned Tee was in Downtown Burlington and had still not heard from Haines. Simms then left Bessette's apartment.

   c. While Simms was driving home, Simms spotted Tee walking in the north end of Burlington and picked him up. Tee told Simms to drive him to Cambridge,

Vermont. Simms felt Tee was not familiar with the area. After making several wrong turns, Tee spotted a vehicle he thought belonged to Haines in a driveway.

d. Simms parked in the driveway behind Haines' vehicle. Tee approached the residence, knocked on the door, and after apparently receiving no response, he returned to Simms' vehicle. Tee did this back and forth between the vehicle and residence several times. He used his phone inside Simms' vehicle, making several calls. Some of the calls were to Bessette. After one of the calls, Tee told Simms that someone may have called the police. Simms drove them away from the residence.

e. Tee told Simms he did not want to leave his belongings at Haines' residence. Several minutes later, Simms drove back to Haines' residence and parked facing away from the building. Tee approached the residence again, leaving the passenger-side door of Simms' vehicle open. Tee knocked on the Haines' door. Simms believed that Tee returned to the vehicle with a duffel bag at that time. Simms thought Tee looked through the duffel bag, then told Simms some articles of clothing and other items of value were missing. Based upon his statements, Simms believed Tee was referring to drugs and/or money, but he never specified what they were to her. Simms saw there was little or nothing inside the duffel bag.

f. Tee asked Simms if she would "freak out" and leave him there if he fired warning shots. Simms told Tee she would remain in the driveway. Tee got back out of the vehicle and closed the door. Simms heard 2-3 noises then Tee quickly returned to the vehicle. Simms described the noises as sounding like Tee was knocking on the house's door again.

      g. Simms drove Tee back to a house on Archibald Street in Burlington, Vermont. They stayed there for the rest of the night. At that residence, Simms saw Tee had a black object. He removed the object from his waist band and placed it into a reusable grocery bag containing miss-matched socks. Simms thought the item was a firearm because Tee seemed to be hiding it from her.

### DNA Evidence Obtained from Haines' Residence

22. The VSP Crime Scene Search Team executed a Vermont state search warrant and collected evidence at the scene of Haines' death on or about March 3, 2020. Among other evidence, investigators collected swabs from two "Mike's Harder" beverage cans from the home's living room. The swabs were collected to attempt to obtain DNA from the cans. They were later submitted to the Vermont Forensic Laboratory ("VFL") for analysis.

23. I have reviewed a VFL report concerning those swabs, and learned that on or about July 20, 2020 the VFL produced a DNA analysis related to the swabs taken from the "Mike's Harder" beverage cans. The analysis revealed the DNA profile of an unknown male. Haines' DNA profile had already been submitted to the VFL for comparison and did not match.

### Convenience Store Surveillance Video

24. Based upon my review of VSP reports and discussions with Sergeant Vooris, I know that VSP investigators reviewed surveillance video from the Cupboard Deli located in Jeffersonville, Vermont showing Haines and a black male, believed to be HERRINGTON (a/k/a Tee) arrive to the Deli in the same vehicle on March 2, 2020 at or about 8:24 pm. Haines was seen purchasing two large canned drinks while HERRINGTON was seen purchasing a bottle of Snapple among other items. They departed the store at about the same time, and both walked off

camera in the direction of the vehicle. The vehicle then left the parking lot. Sergeant Vooris identified HERRINGTON in the video based upon viewing a Pennsylvania Department of Motor Vehicles photograph of him.

Pinger Search Warrant

25. On March 4, 2020 the U.S. District Court for the District of Vermont issued a search warrant directing Pinger, Inc. to produce certain records relating to the phone number 3454. Pinger, Inc. provided records pursuant to that warrant. I reviewed those records on or about March 5, 2020, and learned that the following:

    a. The account was created on March 3, 2020 at 1517 hours (EST).

    b. The third-party email address provided by the user was:

        @icloud.com and the Apple Advertiser identification was:

        2443400D-F35A-478B-A5D3-C002421BCF68.

    c. The Pinger, Inc. username was:                    .

    d. The Internet Protocol (IP) address used at account creation was: 107.77.223.78.

    e. IP logs revealing several additional IP addresses.

26. Using www.ip2location.com, which is an open source internet search site which I have found to be reliable in the past, I learned that 107.77.223.78 is an AT&T Mobility IP address. At least three of the additional IP addresses provided in the IP logs also resolved back to AT&T Mobility according to www.ip2location.com.

Apple iCloud Subpoena

27. On March 5, 2020, I served a grand jury subpoena upon Apple requesting information concerning the Apple account associated with                    cloud.com."

The subpoena requested device identifiers such as the IMEI (International Mobility Equipment Identity) and MAC address for any device associated with that Apple account. Apple produced information subject to the subpoena revealing, among other things, that the account was registered with the name "Taylor Ruffin," with the address Philadelphia, PA.

Indictment and Arrest

28. On March 12, 2020, a grand jury in Burlington, Vermont indicted HERRINGTON for violations of 18 U.S.C. §§ 924(c)(1)(A) (use of a firearm during and in relation to a drug trafficking crime, and 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), 846 (knowingly and willfully conspired with others known and unknown, to distribute heroin). The U.S. District Court issued an arrest warrant for HERRINGTON. FBI Agents in Philadelphia, Pennsylvania subsequently arrested HERRINGTON pursuant to that warrant on March 19, 2020. He was located at                              Philadelphia, Pennsylvania.

**KNOWLEDGE AND TRAINING**

29. I know that the Vermont Forensic Laboratory ("VFL") preforms Deoxyribonucleic acid ("DNA") typing. Based upon my review of material provided by the VFL, I know that DNA is found in every cell of the body except mature red blood cells. DNA is made up of double-stranded molecules inherited from the individual's parents and is the molecular code from which the human body is built. The DNA analysts at the VFL make use of non-coding areas of DNA called short tandem repeats ("STRs") to differentiate from DNA of one individual from that of another individual (except for identical siblings). There is considerable variation in the number of repeat units that may be contained at a particular location

of DNA. Since each individual has two copies of each DNA location, one inherited from each parent, the actual combination of types across the 23 locations examined provides distinguishable profiles for each individual. Currently, the lab uses a method called the polymerase chain reaction ("PCR") to make many copies of small amount of DNA so that they can be typed. The typing results are called a DNA profile.

30.     Based upon my training and experience, as well as my review of open source information on the topic, I know that a buccal swab, also known as a buccal smear, is a way to collect DNA from the cells on the inside of a person's cheek. Buccal swabs are a relatively non-invasive way to collect DNA samples for testing. The procedure involves rubbing a sterile swab on the inside of the individual's cheeks, inside of their mouth, for five-ten seconds. This procedure is completed on an individual's left and right cheeks.

31.     I believe that collection of a buccal swab from HERRINGTON will allow the VFL and investigators to make a comparison between the DNA profile of the unknown male obtained from the crime scene, as set forth above in paragraphs 22-23, and HERRINGTON's DNA profile, thus revealing evidence of the crimes under investigation.

## **CONCLUSION**

32. Based on the forgoing, I request that the Court issue the proposed search warrant.

33. The government will execute this warrant by serving the warrant on Taylor Ruffin-Herrington and obtaining a buccal swab DNA sample, further described within Attachments A and B.

Dated at Burlington, Vermont, this 14th day of October, 2020.

/s/ Jeffrey W. Stephenson
Jeffrey W. Stephenson
Task Force Officer
Federal Bureau of Investigation

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date: **Oct 14, 2020**

Time: **10:04 AM, Oct 14, 2020**

Andrea K. Johnstone
U.S. Magistrate Judge
District of New Hampshire

## **ATTACHMENT A**

**Property to Be Searched**

      This warrant authorizes obtaining buccal DNA samples from Taylor Ruffin-Herrington (DOB        ) as further described within Attachment B.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Buccal (oral) swab collection**

This warrant authorizes the collection of sufficient buccal (oral) swabs from Taylor Ruffin-Herrington (DOB:            to submit such buccal swabs to a forensic laboratory for the purpose of DNA comparison.